### IN THE

## *SUPREME COURT OF JUDICATURE*

### OF THE

## STATE OF NEW-YORK,

#### IN FEBRUARY TERM, IN THE THIRTIETH YEAR OF OUR INDEPENDENCE.

---

### D. *and* G. Ludlow *against* Bowne *and* Eddy.

ALBANY, Feb. 1806.

D. & G. Ludlow
v.
Bowne &Eddy.

Insurance on goods from *New-York* to *France, warranted American property.* The goods were purchased and shipped in an *American* vessel, by *American* merchants, to merchants in *France,* under an *agreement,*

THIS was an action on a policy of insurance, on the *cargo* of the ship *Sisters,* upon a voyage *at and from New-York to Havre de Grace, in France.* At the trial, before his honor, Mr. Justice Livingston, at the New-York *circuit,* the 26th June, 1803, the subscription to the policy, the interest, loss, and abandonment, were admitted, and a verdict found for the plaintiffs, as for a total loss, for the sum of 1153 dollars, subject to the opinion of the court, on the following case :

On the 28th June, 1793,* the defendants underwrote the policy to the plaintiffs, for 300 pounds, at 3 1-2 per cent premium ; and the vessel and cargo were *both warranted American property.* The *Sisters,* with the cargo insured, sailed from New-York, on the 19th day of July, 1793, and was captured during her voyage, by a British cruiser, and after-

---

* The trial of this cause had been delayed for want of proofs, or some other reason, on the part of the plaintiffs.

between them, for that purpose, by which the former were to deliver the goods at St. Vallery, for which they were to be allowed eight per cent commission, taking on themselves *all risks*, expressly including a premium for sea-risk, or insurance, as well as *war-risks*; the consignees to pay the freight on delivery, and also for the amount of cargo, in bills on London, guaranteed by a commercial house in London. During the voyage, the goods were captured by the British, and condemned as French property:—Held that the goods remained the property of the consignors until their delivery in France; and that the warranty in the policy was complied with. Such a contract is legal and valid, and does not

wards condemned in the British admiralty court, *as French property*. The goods insured, consisted of 752 barrels of pot, and pearl-ashes ; 302 barrels of which were consigned to M. M. Francois Poulhain, and Co. and the residue to Messrs. Morgan and Son, merchants, residing at Havre de Grace. They were purchased by the plaintiffs in New-York, and shipped under an agreement made between them and the consignees, the terms of which are contained in the following letter from one of the plaintiffs :

London, May 11, 1792.

" M. Francois Poulhain,

" By the post to-day, I received yours of the 4th instant, directing me to purchase 300 barrels ashes, and some oil, on certain conditions, mentioned to Messrs. Michault. That we may perfectly understand each other, they were, viz. a commission of 2 1-2 per cent on the amount of invoice, and an additional commission of 3 per cent on do. for the war-risk. It is not understood that I am to assume the *usual sea-risk* ; but, for my security, I ought to make the insurance, in order to prove the property mine, in case of capture ; this will be 2 1-2 per cent I must pay to have it done ; so that taking on myself all risks, and delivering you the goods at St. Vallery, save that of the freight, which you must pay, you must allow me 8 per cent on the amount of invoice ;—my bills are to be paid 60 days after the vessel's arrival at St. Vallery, in London, the exchange fixed at par, say, £100 sterling for £177 15 7. New-York currency, with the guarantee of Messrs. Thelusson, for the payment ; —These are the terms mentioned to Messrs Michault, and on which I am willing to execute your orders. You will please to send to Monsr. Blandel a copy for his direction.— When I receive your answer I will write to my house, and you may depend on my attention, and the ashes shipped in season.

D. LUDLOW."

At the time of the shipment of the ashes, the plaintiffs possessed funds, belonging to Morgan and Son, which were afterwards remitted to them ; but they held no funds of M. M. F. Poulhain and Co. The amount of the

goods were charged to those persons respectively, in the books of the plaintiffs.

ALBANY,
Feb. 1806.

D. & G. Ludlow
v.
Bowne & Eddy.

It was admitted that the war commenced between Great-Britain and France, on the 1st February, 1793.

Two questions were raised for the consideration of the court. 1. Who was the legal owner of the goods at the time of their shipment and capture? 2. Was the contract, made between the plaintiffs and the merchants in France, valid according to the law of nations? or, in other words, was the property *American*, within the true meaning of the *warranty* contained in the policy?

change the property, so as to destroy its neutral character, or vitiate the contract of insurance.

This cause had been argued in a former term by *Harison* and *Hoffman*, for the plaintiffs, and *Pendleton* and *Radcliff*, for the defendants. By direction of the court, it was again argued, at the last term, by the same counsel, with great learning and ability.*

The judges, not being unanimous, now delivered their opinions *seriatim*.

TOMPKINS. J.—Two questions are presented by this case. 1. Whether the property in the goods insured, and shipped under the contract stated, belonged, during the transportation, to the plaintiffs, or to the consignees at St. Vallery?

2. Whether the contract be valid according to the established principles of the laws of nations?

The goods in question were purchased by the plaintiffs with their own funds, and upon their own credit, and it is not controverted, but that they vested in the plaintiffs, on the delivery to them by the persons of whom they were purchased. There was no privity between the French merchants and the original vendors; nor could the former be responsible to the latter for the price agreed to be paid for them. That this property was not divested by the subsequent delivery of the goods to the captain, will be evident,

---

* In this, and several other causes, argued at the last term, the reporter must crave the indulgence of the counsel for the omission of their arguments. Not expecting, at the time, to report the cases, no notes were taken, and it would be doing injustice to the gentlemen concerned, to give an imperfect account of what was said by them.

if we attend to the terms of the contract under which they were shipped. The goods, after their arrival at the port of destination, were not, at all events, to go into the possession of the consignees. The French merchants were not entitled to receive the goods until they had performed the precedent conditions as to the payment, stipulated in the agreement. If they had never arrived at St. Vallery, the Messrs. Ludlow could not have resorted to the French merchants, according to the terms of this contract, for the stipulated price ; on the other hand, had the latter failed to perform the conditions on which the goods were to be delivered, they never could have compelled the plaintiffs to deliver them. Had a loss happened by the perils of the sea, and the insurers become insolvent ; had the goods been destroyed by accident in the warehouse before they were laden ; had the consignees refused to pay freight ; had the failure of Messrs. Thelusson and Co. put it out of the power of the consignees to obtain the stipulated security ; or had the vessel by stress of weather, been driven into a different port, and there terminated her voyage, the cargo would have continued in the plaintiffs, and the loss or profit in either event, would have remained to them. Indeed, it seemed to be conceded by one of the defendants' counsel in the argument, that the legal ownership of the goods was in the plaintiffs ; and the ground of defence was confined to the objection, that this contract was a mere cover, and fraudulent and void, as it respected belligerents.

Fraud ought not to be presumed ; and, unless the agreement itself purports fraud, or is one forbidden by the acknowledged principles of the laws of nations, the plaintiffs in this case ought to recover.

It cannot be denied that a neutral may, without contravening any established principle of the law of nations, carry on commerce with either of the belligerent parties, in the same manner and to the same extent as in time of peace, except in articles contraband of war, or to a blockaded port. The decisions in the court of admiralty in England, so much relied on, by the defendants, have not proceeded on the notion that a neutral cannot, *flagrante bello*, contract to sell

and consign his own goods to a belligerent for a stipulated profit, to be paid on delivery.—The determinations which have been made on contracts, somewhat similar to the present, are supported by a rule of evidence peculiar to those courts, a *presumptio juris et de jure*, by which such contracts are determined to be fraudulent and collusive, and made for the purpose of covering the property of an enemy. They have considered the capture, as equivalent to a delivery to the belligerent to whom it is consigned, and to whom it is thus presumed to belong. Without arraigning those decisions, it is sufficient, in the present case, to say, that such an arbitrary rule of evidence is not to be resorted to here, and that the contract in question does not afford that presumption; on the contrary, its provisions are of a nature to exclude every reasonable inference of fraud, and to evince the neutrality of the property. The checks interposed which might prevent its ultimate delivery to the consignees at St. Vallery; the security to be given, and the conditions to be performed to entitle the latter to receive the goods, and the assumption of all risques by the consignors, until the delivery of the property, are satisfactory evidence to my mind, that the contract was *bona fide*, and that in the contemplation of the parties, the ownership and controul of the property was to continue in the plaintiffs, who retained the right wholly to refuse the delivery of the goods, in case the consignees should fail to perform the conditions previously stipulated. For these reasons, I am of opinion, that the plaintiffs have complied with their warranty, and that they ought to recover the amount insured by the defendants.

SPENCER J.—By the contract entered into between the plaintiffs and the French merchants, the property in the ashes, insured and warranted to be American, remained in the plaintiffs until its delivery to the French houses at St. Vallery.—The delivery could not be insisted on, until bills for the amount on London, payable in sixty days after the arrival of the goods at St. Vallery, with the guarantee of the Messrs. Thelusson, had been furnished by the consignees to the plaintiffs.

The goods having been captured and condemned, on

ALBANY,
Feb. 1806.

D. & G. Ludlow
v.
Bowne&Eddy.

their way to St. Vallery, there can be no pretence to say, that the property at the time of capture did not exclusively belong to the plaintiffs. The defendants' counsel did not controvert the proposition, that by the rules of law, as between the plaintiffs and the French merchants, the property never had been divested from the plaintiffs. But it was insisted that there was an *equitable* interest, by virtue of the contract vested in the consignees, which, from a state of war between France and England, justly exposed the property to capture, and that, by the laws of nations, property so circumstanced, was liable to capture and condemnation, on the ground of its being fraudulently covered, with an intent to evade capture, and to supply a belligerent. These two propositions remain to be examined.

It is difficult to perceive in what manner the French merchants had acquired a vested equitable interest in these goods. The contract was in its nature executory, and no part of the price had been paid; they had an expectation of receiving them, but on no legal principles were they cloathed with the rights of a *cestuy que trust*. It has been fancifully said, that, because the goods were consigned to them, the capture by the English is to be deemed a delivery to the consignees.—— In the view of a court of admiralty, this may be so, but most certainly, if the Frenchmen were amenable to our own laws, the plaintiffs could never recover of them the price of the goods, under that notion. Nothing but an actual delivery, or offer to deliver, would render them responsible upon the contract.

The goods in question not being contraband, within the utmost latitude to which that list has been swelled, were a lawful subject of commercial adventure by a neutral in time of war. The warranty that it was neutral has been verified. This warranty cannot be extended so far, as that the property shall be regarded neutral by belligerents, but only that it is truly so, according to the code of the laws of nations.

The cases decided by Sir William Scott, do not bear an analogy to the present. In this, the property was not absolutely to vest in the French houses on its arrival at St. Vallery; certain acts were to be done on their part, as conditions

precedent; as the drawing of the bills on London, with a guarantee for the amount of the cargo. These acts were contingent, and might never be performed.

It appears to me, that the English courts of admiralty, on questions, bearing a resemblance to the present, are governed more by ideas of political expediency, and of the necessity of destroying any commerce with their enemy, than by the laws of nations. The high court of admiralty in England, probably regarded this shipment as a fraud on belligerents, in attempting to evade capture and condemnation; but I do not feel myself bound by their precedents, nor required to justify their solicitude to condemn, from motives of policy.

By the law of nations, a neutral has a right, with the exceptions of contraband goods, and going to a blockaded port, to supply the belligerents. This right, enforced by considerations of justice, as it regards neutrals, is not to be frittered away by inquiring whether a belligerent has, by one mode of supply, or another, a prospect of greater mercantile advantage. The true inquiry is, is the property a muniment of war, within the list of contraband, and does it belong to an enemy, or a friend? Thinking, as I do, that the warranty in this case has been fulfilled, and that at the time of the capture, the goods belonged to the plaintiffs, I must say, that they are entitled to judgment.

THOMPSON, J.—The questions presented by this case are, 1st. In whom must the right of property in the shipment be deemed vested at the time of capture? 2d.—As to the legality of the contract made between the plaintiffs and the French merchants.

The subject insured consisted of pot and pearl-ashes, warranted *American property*. The shipment was made under an agreement, and upon the terms stated in the letter of Daniel Ludlow, of the 11th of May, 1792, contained in the case, and to which we must resort, in order to ascertain the rights of the contracting parties; and, in doing this, the contract must be construed, without reference either to a state of peace or war; that point will come under consideration in the examination of its legality.

According to my understanding of the agreement, without entering into a minute detail of its several parts, the fair and obvious import of it is, that the plaintiffs stipulate to take all risks, of every description whatever, upon themselves, and to deliver to certain French merchants, at St. Vallery, in France, a quantity of goods, upon certain conditions, to be performed on their part. These conditions were, that they should pay the plaintiffs the amount of the invoice price, with the addition of eight per cent on such amount, the payment to be made in London, sixty days after the vessel's arrival at St. Vallery, and the guarantee of Messrs. Thelusson to be given for such payment, the French merchants also paying the freight. Though the case states generally, that the cargo was consigned to the French merchants; yet it is to be observed, that the contract contains no stipulation that they were to be the consignees. This consignment must therefore be open to explanation, whether made to them on their own account and risk, or on account and risk of the consignees. Here then arises the question. Where a shipment is made, under such circumstances, in whom must the property be deemed vested, until its arrival? I think, clearly, in the plaintiffs. I cannot consider the plaintiffs as acting in the character of mere agents; part of the allowance to be made to them is, to be sure, classed under the denomination of commissions, which, in mercantile language, may generally be considered as a compensation for the services of agents or factors; yet this circumstance, of itself, is not sufficient to restrict them to that character, when, from the general scope and nature of the transaction, they are represented as principals. The plaintiffs having funds in their hands belonging to one of the French houses could not, in any manner, qualify their character. These funds were not to be applied to the purchase of, or as payment for, this cargo. By the contract, payment was to be made in London; besides, these funds have since been remitted; at what particular time, however, does not appear. The plaintiffs, then, must be viewed in the capacity of vendors, making a contract with respect to this shipment, which was to be consummated in France; and the most that can be said,

is, that they had secured a market on its arrival there. The argument most urged, on the part of the underwriters, is, that this cargo went consigned to the French merchants, which, it is said, vested in them the right of property. I do not think it necessary to controvert the general proposition, that when goods are shipped on account of, and consigned to a foreign merchant, the property shall, *prima facie*, be deemed vested in the consignee, subject to the right of stopping *in transitu*, in case of insolvency. In such cases, probably, the master of the ship ought to be considered as the agent of the consignee, and a delivery to the former, equivalent to a delivery to the latter; neither can it be denied that where the consignment is for account of the consignor, the property remains vested, in him and he is deemed the legal owner, 12 Mod.\* 156. The consignment is always subject to be controlled, and explained, according to the understanding, and evident intention of the parties, 1 D.& E.Rep.† 748. So that admitting it to have been general to the French merchants, if it be manifest that it was not the intention of the parties to vest in the consignees the right of property, such must be considered as the legal operation of the consignment. That it was the intention of the parties that the property should remain vested in the plaintiffs, cannot, it appears to me, admit of a doubt, otherwise the consignment is at war with the contract, and the whole tenor of the transaction.

Whatever may be the general rules of law, and the ordinary course of commerce applicable to any given class of cases, there can be no doubt that these general rules may be varied and modified, by special agreement, 3 P.Wm.186.‡1 D. & E. Rep. 748. This was admitted in its fullest extent by Sir William Scott, in the case of the packet, *De Bilboa*, 2 Rob. Rep. 133. The vesting of property, says Lord Mansfield, may differ according to the circumstances of cases, 5 Burr. 2680.§ The general rule of law is, that, as between vendor and vendee, the property is not altered until the delivery of the goods, 1 Atk.245.‖ 1 Hen.Black.Rep.35.¶ 3 D.& E.Rep. 469.\*\* A distinction is, sometimes, made between an actual delivery to the vendee himself, and a constructive delivery to some intermediate person. In the latter case, when the

Vol. I.　　　　　　c

ALBANY,
Feb. 1806.

D. & G. Ludlow
v.
Bowne&Eddy.

\* *Evans* v. *Martell.*

† *Hibbert* v. *Carter.*

‡ *Godfrey* v. *Furzo.*

§ *Davis and another* v. *James.*

‖ *Snee and others* v. *Prescott and others.*

¶ *Mason* v. *Lickbarrow.*

\*\* *Ellis* v. *Hunt.*

goods are at the risk of the vendee, it is equivalent to an actual delivery, 3 D. & E. Rep. 469. Every legal contract may, however, be modified according to the will of the contracting parties ; and, when special, it is to that we must look, in order to ascertain their rights.    It cannot, I think, be denied, that in the present case, it was obviously the intention of the parties, that the entire dominion and controul over this property, should remain in the plaintiffs, until its arrival in France.    The insurance was to be made by them, and for their own benefit.    The property was, by the terms of the contract, expressly at their risk. If lost, the loss would have fallen on them ; or if the underwriters had become insolvent, the loss would have been theirs. And Sir William Scott observes, that this is the true criterion of property.    He is to be deemed the proprietor on whom the loss would fall, in case of accident, 2 Rob. 135.    This is certainly a just and rational criterion,  between the vendor and vendee ; the former is presumed to get a compensation for the risk, and the loss is therefore, to be borne by him.

The guarantee of Messrs. Thelusson, for the payment of the plaintiffs' bills in London,  may be considered as a condition precedent ; and if so, the Messrs Ludlow would have had a right to demand such guarantee, before the French merchants could have claimed a delivery of the property.    The plaintiffs appear to have studiously guarded the contract, so as to retain the controul over the shipment, until they should be secured in the payment for it.    For this purpose, they assumed all risks of every description, until its arrival in France. There was the place designated for the consummation of the contract. The master of the vessel must have been their agent, and the bills of lading given on their account and risk, in order to retain the security ; that being one of the principal ingredients in the contract. That the French merchants, stipulated to pay the freight,  cannot be material,  according to the opinion of Sir William Scott, in the case of the packet *De Bilboa* ; and, indeed, he admits in that case, that a contract like the present, in time of peace, would be legal,  and the right of property remain vested in the vendor.    The parties have a right to stipulate, that the whole risk should fall on the con-

ALBANY,
Feb. 1806.

D. & G. Lud-
low
v.
Bowne &Eddy.

signor, until the goods come into possession of the con-signee, or they may divide the risk, as they please. Thus far, I have considered this transaction, as between vendor and vendee, without any reference to the rights of third persons ; and, I think, I am warranted in concluding, that, as between them, the property must, at the time of the capture, be deemed to have vested in the plaintiffs. If so, their warranty has not been broken, unless the contract, under which the shipment was made, was illegal, and void.

The second question, then, arises as to the legality of the contract. The warranty that the property was American, means that it was so by the law of nations. This was so determined in the case of *Duguet v. Rhinelander*, January Term, 1800. If I am correct in the conclusions above drawn, that a contract like the present, would, according to the law of nations, be legal in time of peace, and, that according to established principles of law, the property would be deemed vested in the plaintiffs until an actual delivery in France, I cannot suppose that a state of war would change or vary the rules. I find no such principles recognized in the law of nations. The general rule is, that neutrals have a right to carry on commerce with the belligerent, the same in war as in peace, except in contraband goods, and to blockaded ports. Contracts, like the present, have unquestionably been considered, by Sir William Scott, in the British admiralty courts, as illegal ; and, were the rules there adopted, to govern the case before us, we should be bound to pronounce that there had been a breach of the warranty. The warranty, however, is not to be tried by those rules, unless they are sanctioned by the law of nations. That courts of admiralty are, sometimes, governed by special instructions, which are not in perfect conformity with the general law of nations, cannot be denied. The rights of neutrals, as well as those of belligerents, are to be regarded and protected. And it is not enough, for the belligerent to say to the neutral, that because my right of capture is taken away, your trade is illegal. It is, undoubtedly, the interest of belligerents to consider all property bound to an enemy's country, as belonging to an enemy, and of course, exposed to capture and condem-

ALBANY,
Feb. 1806.

D. and G. Lud-
low
v.
Bowne & Eddy.

nation; but they have no right, in order to effect this, to establish arbitrary rules of property; one incroachment leads to, and forms a precedent for another, and if yielded to, it is difficult to say where they will end. There can be no doubt that the plaintiffs would have had a right to ship the cargo in question, not having made a contract for its sale, on its arrival in France. It was not contrabánd, nor bound to a blockaded port. What have they done then by. this contract? Nothing more than to secure a market, on its arrival, in France. What injury is done to belligerents? It is said, that their right of capture is taken away, and so it would have been had the shipment been made, and no contract previously entered into. If abridging the chance of capture be sufficient to render commerce illegal, all trade by neutrals would be so. Sir William Scott gives us no authority to shew that a contract, like the one before us, is illegal, according to the law of nations. For aught that appears to the contrary, the principle originated with him, or grew out of the special instructions of his government. He, however, only says, that it is a rule of the prize-courts, that the property going to be delivered in the enemy's country, and under a contract to become the property of the enemy, immediately on arrival, if taken *in transitu*, is to be considered as enemy's property. 3 Rob. 302.* *note.*

* The Atlas—
case of *the
Sally*, Griffiths.

If by a rule of prize-courts, he means only a rule of evidence, by which to ascertain the real owner, or, that a cargo taken under such circumstances, shall, *prima facie*, be considered enemy's property, the rule, perhaps, may not be so exceptionable. But I cannot give my assent to it as a rule controuling the right of property. Property is, unquestionably, frequently transported under covered contracts, and, in this way, fraud is practised upon belligerents. It is not, therefore, matter of surprise that their suspicions should be excited. But it is no just reasoning to say, that because a transaction may be fraudulent, it is fraudulent. Every case must stand on its own merits; and, I see nothing in the one before us, to warrant the conclusion, that this was a fraudulent, or covered transaction, or that the contract does not represent the truth with respect to the ownership

of the property; if so, and this be a legal contract, as I have endeavoured to shew, I am at a loss to discover the grounds for saying there has been a breach of the warranty. Fraud would no doubt vitiate the contract; and could I legally intend, from the facts stated in the case, that this was a speculation tainted with that malady; that the property had ever legally vested in the French merchants; and that the contract was a mere cloak, for the purpose of deceiving belligerents, I should, most certainly, withhold from it my sanction. If such had been the intention of the parties, why enter into a contract, which, upon the face of it, might have the least appearance of unfairness? If the contract does not represent the real truth of the transaction between them, security for their respective rights must depend on some private and confidential understanding; in which case, the present contract would be idle and nugatory. If fraud is to be imputed to the parties, it must be an inference of law, arising from the contract; for nothing *dehors* the agreement is shewn, in the least tending to such a conclusion, except that it was made during hostilities between France and England; and this does not appear to me suffi.ient to warrant the inference. I see no impropriety in a French merchant's saying to an American merchant, if you will send your goods to France, I will purchase them of you, or to agree beforehand on a stipulated price, on their delivery in that country. The French merchant may not choose to run the risk of transportation, which the American merchant, for the sake of the profits arising out of the contract, may be willing to assume. I know of no law, nor any principle of reason or justice, that will deprive him of this privilege, provided the property continue really, and *bona fide,* the property of the American merchant, until its delivery in France. According to my understanding of the case, then, its whole merits depend on the question, in whom was the property vested at the time of capture? And in whatever point of light I view it, I cannot resist the conclusion that it was in the plaintiffs.

My opinion, therefore, is, that they are entitled to judgment.

KENT, C. J. There is no dispute, between the parties in this cause, as to the neutrality of the vessel. The affidavit of John Jackson, which is agreed to be received as part of the case, sufficiently establishes that she was American property. The great point is respecting the neutrality of the cargo. The question is, who were the legal owners of the goods after their shipment and consignment to the merchants at Havre ;—the plaintiffs, or their consignees ? The plaintiffs are directed by a French house, to purchase and transmit them certain goods. They make the purchase, charge their commission for executing the order, and ship the goods under a consignment to the French house. The freight, or expense of transmission, was to be borne by the consignees, and the *risks* attending the transportation depended upon a special, and peculiar agreement between the parties. This agreement deserves particular attention, as the merits of the cause will turn upon its construction, and legal operation. This agreement is rather deficient in precision, but as I understand it, the plaintiffs expressly declare, that they were not to assume the usual sea-risks ; but that they *ought* to make the insurance, in order to prove the property theirs in case of capture, and that they would have to pay 2 1-2 per cent for that insurance, and consequently, they charge that advance to their correspondents. But they are to have a *commission* for the war-risks. This they ask as a premium for assuming that risk, or in other words, a belligerent *hires* a neutral at a *commission* of 3 per cent, to take upon himself the war-risk. The neutral will not assume the usual sea-risk. That he expressly declines, but, in order to render this assumption of the war-risk less hazardous, he says the insurance must be *in his name*, and he only charges what he will have to advance, to effect it. The insurance was, therefore, an ordinary neutral insurance, estimated at 2 1-2 per cent, and the plaintiffs, no doubt, made it as *trustees* for the French merchants, for whose benefit it was to enure, if the property was lost by the perils of the sea. The plaintiffs, upon this agreement, were then to make a clear gain of 5 1-2 per cent, all of which they emphatically term their *commission ;* part of

it was for their compensation as agents, and the residue as a premium for the war-risks they assumed. They ask no premium for the ordinary sea-risks, because, it was agreed that they were not to assume them ; and, of course, those risks must be borne by the consignees, *who paid the insurance of those risks*, amounting to 2 1-2 per cent. This appears to me to be the real solution, the just analysis of this extraordinary contract. When, therefore, the plaintiffs, in the concluding part of their letter, speak generally of taking *all risks*, and of receiving an allowance of 8 per cent, this is easily explained, *reddendo singula singulis*, as the antecedent parts of the letter had particularly specified what risks were to be assumed by the plaintiffs, and by what means, and for what services, the allowance was to arise. *Generalis clausula non porrigitur ad ea quæ antea specialiter sunt comprehensa.*

If we consider this contract, for a moment, independent of these singular provisions about the risk, the general rule of law would be, that the property vested in the consignees upon the shipment and delivery to the master. But as even this principle seemed to be questioned upon argument, it is proper to look into the authorities upon which it rests. A delivery to an agent, for, and on behalf of his principal, will transfer the property equally with a delivery to the principal himself. This is an elementary rule in the transfer of property, and the master of the vessel is considered as the agent of the consignee. In the case of *Evans* v. *Martell*,[*] 1 Ld. Ray. 271, it was ruled by Lord Holt, and the Court of K. B. that if goods by bill of lading, are consigned to A, A is the owner, and must bring the action against the master of the ship, if they are lost. So, in the case of *Godfrey* v. *Furzo*, 3 P. Wm. 185, the like rule was laid down by the attorney general, and agreed to by Lord Chancellor King. It was there said, that on delivery of the goods to the master of the ship, the property immediately vested in the consignee, who was to run the risk of the voyage. The same point was noticed, and recognized by Lord Chancellor Hardwicke, in the case of *Snee* v. *Prescot*, 1 Atk. 248, in which he

[*] S. C. 12 Mod. 156.

admitted, that if goods are delivered to a carrier to be delivered to A, and they are lost, the consignee only can bring the action, which shewed the property to be in him ; and he said it was the same where goods are delivered to a master of a vessel, though he allowed, at the same time, the right of the consignor to stop *in transitu.*

The right of stoppage *in transitu,* as between vendor and vendee, came from the court of equity. The first case in the books, is that of *Wiseman* v. *Vandeputt,* 2 Vern. 203, in chancery. On the first hearing, the chancellor ordered an action of trover to be brought, to try whether the consignment vested the property in the consignee ; and it was then determined, in a court of law, that it did. But equity thought it right to interpose and give relief, and since that time this new rule of stoppage *in transitu,* has been admitted in courts of law as well as equity, between consignor and consignee, in case of the insolvency of the latter, and before actual delivery. This rule, however, is not considered as altering the strict right of property, which, by the old rule of law, vested in the consignee upon delivery to the carrier for him, and at his risk. The delivery to the carrier is a *constructive* delivery to the vendee, and the goods are considered in the possession of the vendee, the instant they pass out of the possession of the vendor, *to every other purpose,* but that of defeating this equitable right of reclaiming the property, upon the insolvency of the vendee. Buller J. in *Ellis* v. *Hunt,* 3 Durn. 469. In the late cases of *Oppenheim* v. *Russell,* and *Dutton* v. *Solomonson,* 3 Bos. & Pul. 48, and 582,* the court of C. B. considered the rule as well settled as any in the law, that upon delivery of goods to any general carrier, the whole property immediately vested in the purchaser, subject to this right of stoppage upon the insolvency of the purchaser. The only additional case that I shall mention is, that of *Coxe* v. *Harden,* 4 East. 211, in the K. B. and that will be found upon examination to be a very strong and pointed authority. It was upon a purchase by agents abroad under orders, and when the goods were shipped, the shippers drew upon their principals for the amount in favour of third persons payable

in sixty days, and gave notice, that they expected the bill would meet with due honor. The bill was transmitted at the same time, and in the same manner with the invoice and bill of lading, and the bill of lading was *to the order of the shippers, and unindorsed.* Under all these circumstances, however, the court had no hesitation in considering the property to have vested upon the shipment. They said, that a delivery to the master of a general ship, under a consignment, was a delivery to those to whom, and for whose use, the goods were sent, and at whose risk they were, during the passage, and that the property was subject only to be divested by the shipper's right of stopping in *transitu,* which they termed a species of *jus postliminii.* It was, indeed, contended, in that case, that as the bill of lading was unindorsed, and the bill of exchange for the amount transmitted concurrently, it showed that the shippers did not intend to convey the property, except, conditionally, in case of the acceptance of the bill. But the answer was, that the shipment was at the risk of the consignee, without any such words of condition annexed. The same answer may be given to the like objection which the counsel raised, in this case, as the shipment here was in pursuance of orders, without any condition being annexed, to the delivery, or shipment, relative to the furnishing of the guaranteed bills on London, and was, also, at the ordinary sea-risk of the consignees. This last risk they must be deemed to have borne, as the shippers here declared they were not to assume it, as it falls, of course, upon the consignee without a special agreement to the contrary, as the consignees were at the expense of the insurance, and as the party who is at the expense of the insurance, is clearly at the expense of the risk.

These recent decisions in the English courts, I consider as correct expositions of the common law, for they only illustrate more fully the same principles which we find recognized in the time of Lord Holt. We have not, nor ever had, any such rule in our law, as that to be found in the Civil, and French law, (Inst. 2. 1. 41, and *Pothier Traité du Contrat de Vente, n* 322,) by which even a delivery does not

Vol. I.                D

transfer the property without payment, unless a credit be given. It would have been necessary to apologize for thus multiplying cases to a point which appears to have been so clearly and permanently settled, had not this very question, in whom was the title after the shippers had consigned the goods and delivered them to the master? been much examined upon the argument, and very different conclusions suggested.

The question on the right of stoppage, does not arise in the present case; and, if it did, it is admitted (3 *Bos.* and *Pul.* 43. 47.) that the right prevails only, as between consignor and consignee, and does not affect the rights of third persons. The principle of the court of K. B. in the case of *Lickbarow* v. *Mason*,* is now considered, (*Abbott* 313—4. 4. *East.* 217.) as the true and settled rule of law; which is, that if the consignee assign the bill of lading for a valuable consideration, and without notice, the property is thereby transferred, and the consignor is divested of his right to stop, as against such assignee. The present case is to be considered in the same light, as if it were a contest between the consignor, and third persons, who by the right of war have succeeded to the interest of the consignee.— Title by capture by an enemy of the consignee, in open war, is as valid, as if it had been acquired by assignment, and equally puts an end to the claims of the shipper; because, taking possession by the captor is equivalent, in respect to the question of property, to an actual delivery to his enemy. But we are told that the title to the goods is in him who bears the risk of the transmission. If that rule were to prevail equally in time of war, as in peace, the present case would not be affected by it, for the risk was here *divided* between the parties. The plaintiffs took, by agreement, the war-risk, and charged a commission for it. The consignees were left to bear the sea-risk, and had it insured at their expense; though the insurance was effected in the name of the plaintiffs, the better to secure themselves against the other risk. The question, however, arises, whether the agreement to assume the war-risk was, in judgment of the law of nations, a valid agreement, as it respects the

* See in a *note,* in 6 East Rep. p. 21—36, the very elaborate opinion of Mr. justice *Buller,* delivered by him in the House of Lords, for reversing the judgment in Error, given in the Exchequer Chamber, 1 H. Black. 357, in this cause, in which the whole law on this subject is very fully examined.

claims of a belligerent captor. The English prize-courts hold all such agreements, made in time of war, constructively fraudulent and void, and they will not allow a neutral and belligerent, by a special agreement, to change the ordinary rule in time of peace, by which goods, ordered and and delivered to the master, are considered as delivered to the consignee. (3 *Rob.* 300, *in notis*, 2 *Rob.* 133.) The reason assigned is, that such agreements would operate so as to cover completely all belligerent property, whenever the neutral was disposed, or could be hired to do it, since the risk of capture would be laid alternately on the consignor, or consignee, as the neutral factor should happen to stand in one, or other of those relations. The admission of this practice, would certainly afford great opportunities, and great temptations to fraud. The admiralty principle, takes a strong hold on the mind, since its object is to prevent fraud, and to cherish good faith, which is a fundamental axiom in the code of public as well as municipal law. It is not requisite, however, to place this case within the reach of that decision, nor to assume the rule in the latitude it is there laid down ; for the agreement before us, strikes me as being fraudulent *in fact*, and contrary to that candor, and good faith, which the law of nations requires. The goods were shipped in time of war, and the agreement appears to have been made, with an express and pointed reference to maritime capture. For what other purpose, I would ask, but to cover the property from capture, should the plaintiffs assume the war-risk, and ask for it a commission, and yet leave the ordinary sea-risk to be borne by the French merchants, or by insurances at their expense? Why did the plaintiffs propose to make the insurance in their own names, but to blind the belligerents ? or, according to their own emphatic language, to *prove the property theirs in case of capture.* If these propositions, made and assented to, do not prove a collusive agreement to cover property, I should be at a loss to know what other combination of circumstances would amount to such proof. It appears to me, plainly and strongly, that they were made for that purpose, and no other ; and that the agreement ought, therefore, to be deemed void. If so, it then results that

ALBANY,
Feb. 1806.

Tucker
v.
Juhel and
another

the property of the cargo was not *American*, and that the warranty is broken.

LIVINGSTON, J. having been concerned as counsel in the cause gave no opinion.    Judgment for the plaintiffs.